IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JA'KARI WHETSTONE,           *
                             *
        Plaintiff,           *
                             *
vs.                          *    CIVIL ACTION NO. 20-00280-TFM-B
                             *
CYNTHIA STEWART, *et al.*,    *
                             *
        Defendants.          *


## REPORT AND RECOMMENDATION

Plaintiff Ja'Kari Whetstone, a former Alabama prison inmate,[1] filed a *pro se* complaint under 42 U.S.C. § 1983. (Doc. 1). This action was referred to the undersigned Magistrate Judge for consideration and disposition or recommendation on all pretrial matters as appropriate pursuant to 28 U.S.C. § 636(b)(1)(B) and S.D. Ala. GenLR 72(a)(2)(R). (Doc. 3). It is now before the Court on Defendants' motion for summary judgment. (Doc. 36). For the reasons set forth below, it is recommended that the motion for summary judgment be **GRANTED**, and that this action be **DISMISSED**.

---

[1] When Whetstone initiated this action in May 2020, he was incarcerated at Donaldson Correctional Facility in Bessemer, Alabama. (See Doc. 1). He subsequently notified the Court of his release from prison in May 2021. (Doc. 31).

I.  **BACKGROUND**

    A.  **Whetstone's Complaint.[2]**

Plaintiff Ja'Kari Whetstone ("Whetstone") brings this suit against Defendants Warden Cynthia Stewart ("Stewart"), Warden Terry Raybon ("Raybon"), and Warden Phillip Mitchell ("Mitchell"), for failing to protect him from attack in July 2018 when he was housed in the A-Dormitory at Holman Correctional Facility. (See Doc. 1).

Specifically, Whetstone alleges that during the breakfast feeding on July 29, 2018,[3] he was attacked in A-Dorm by inmate Gaberion Birdsong and eight other inmates who were not known to him. (Id. at 9). Whetstone asserts that he was stabbed twenty-nine times, and that no officers were present in A-Dorm to provide supervision at the time of the attack.[4] (Id. at 5-6). He further asserts that he tried to fight off his attackers, and approximately

---

[2] Because Whetstone's complaint was signed under the penalty of perjury (see Doc. 1 at 7), the Court will consider the factual allegations in the complaint in ruling on the motion for summary judgment. See Perry v. Thompson, 786 F.2d 1093, 1095 (11th Cir. 1986) (per curiam).

[3] Whetstone's complaint alleges that the incident occurred on July 29, 2018. (See Doc. 1). However, the institutional and medical records filed by Defendants reflect that Whetstone was in fact stabbed on July 15, 2018. (See Docs. 26-1, 26-2, 26-3, 32-2, 32-3).

[4] Later in his complaint, Whetstone alleges that he received "a total of 27 stab wounds along with one untreated stab wound to the head and a pun[c]tured lung." (Doc. 1 at 20).

three-and-a-half minutes into the fight, the nine inmates "just departed ways in several direction[s], leaving [him] there, bleeding from the attack." (Id. at 10). Whetstone states that "Lt. Frank" showed up a few minutes later to escort him to the Health Care Unit, where he received treatment for his wounds, including placement of a chest tube. (Id. at 10, 20-21). Whetstone was then transported by ambulance to Atmore Community Hospital. (Id. at 10, 21).

Whetstone is suing Defendants Stewart, Raybon, and Mitchell for failing to protect him from the inmate-on-inmate attack in violation of the Eighth Amendment. Specifically, Whetstone alleges that these Defendants created a substantial risk of serious harm to him by failing to correct the "egregious level of understaffing" at Holman and "placing" him in an overcrowded dormitory with no officers present to supervise the inmates. (Id. at 14-17). Whetstone is suing the Defendants in their individual capacities and seeking $300,000 in both compensatory and punitive damages. (Id. at 1, 7-9, 17).

**B.  Defendants' Answer and Special Reports.**

Defendants filed an answer denying that they failed to protect Whetstone from other inmates and asserting all available immunity defenses. (Doc. 25). Defendants also filed special reports and supporting exhibits, including their sworn affidavits; the Incident Report; the Duty Post Log and Post Assignment Roster for

both July 15, 2018 and July 29, 2018; Whetstone's Body Chart; Whetstone's medical records; and the I&I Investigative Report. (Docs. 26, 32).

In affidavits attached to the special reports, Wardens Stewart and Mitchell aver that they were not present at Holman when Whetstone was attacked. (Doc. 26-5 at 1; Doc. 32-1 at 1). The wardens aver that Holman has several procedures in place to reduce incidents such as inmate stabbings.[5] (Doc. 26-5 at 2; Doc. 26-6 at 1; Doc. 32-1 at 2). According to Defendants, frequent unannounced searches are conducted of an inmate's person, inmate living areas, and other areas of the facility; all officers are required to conduct at least five random searches of inmates, their personal property, and their assigned living areas per day; and monthly area searches of the facility are also conducted. (Doc. 26-5 at 2; Doc. 26-6 at 1-2; Doc. 32-1 at 2). Defendants also contend that a review of the post assignments for the day in question reflects that there were an adequate number of staff on duty to provide security for the dorms in population, and that a

---

[5] Wardens Stewart and Mitchell state that every inmate incarcerated by the Alabama Department of Corrections is oriented by a staff member who explains the information provided in the inmate handbook, which sets forth ADOC's major rules, regulations, and policies that apply to everyone and are designed to help the inmate population live together as safely and comfortably as possible. (Doc. 26-5 at 1; Doc. 32-1 at 2).

correctional officer was assigned as the dormitory rover for Housing Unit A.  (Doc. 26-5 at 2; Doc. 32-1 at 2).[6]

The July 15, 2018 day shift Post Assignment Roster reflects that Lieutenant Franklin was assigned as the Population Shift Commander, Lieutenant Banks was assigned to the Restrictive Housing Unit, Officer Bullard was assigned as the Rover for Dorm A, and Officer Madison was assigned as the Segregation Rover.  (Doc. 26-3 at 8).  The Post Assignment Roster further reflects that the towers and cubicles were fully manned, and that no officers were assigned to the Dorm B Rover, Dorm C Rover, Dorm D Rover, Main Hall Rover, Infirmary Rover, or Death Row Rover posts.  (See id.).  The Post Assignment Roster and Duty Post Log do not reflect that Wardens Stewart, Raybon, or Mitchell were on duty or on call the day Whetstone was attacked.  (See id. at 2, 8).

The Duty Post Log reflects that during the institutional count at 6:50 a.m. on the day of the attack, there were 574 inmates in Population (Dorms A-E), 177 inmates in Segregation, 153 inmates on Death Row, four inmates in the Infirmary, and six inmates outgated,

---

[6] The Post Assignment Roster reflects that the prison was staffed as follows: (1) Shift Commander – Lt. Franklin, (2) RHU – Lt. Banks, (3) Shift Clerk – CCO Martin, (4) Rover for Dorm A – Bullard, (5) Rover for Dorm E – Parham, (6) Kitchen Rover – Whalen, (7) Perimeter 848 – Lane, (8) Tower 1 – McCants, (9) Tower 2 – Broadhead, (10) Cubicle 1 – Kelly, (11) Cubicle 2 – Vignolo, (12) Cubicle 3 – Watson, (13) Cubicle 4 – Bass, (14) Cubicle 5 – CCO Crawford, (15) Segregation Rover – Madison.  There were also two officers assigned to outside hospitals.  (Doc. 26-3 at 8).

for a physical total of 908 inmates and a grand total of 914 inmates. (Id. at 2). At the population breakfast feeding, which began at 7:03 a.m., Officer Bullard, the Dorm A Rover, was assigned to the exit door, while other officers were assigned to the entrance door and the serving line. (Id.).

The Incident Report states that at approximately 7:40 a.m. on July 15, 2018, Correctional Officer Antwon Madison observed Whetstone bleeding in A-Dorm. (Doc. 26-1). Whetstone was escorted to the Health Care Unit to be medically assessed by a nurse. (Id.). A Body Chart was ordered, and it reflects that Whetstone suffered one puncture wound each to his left upper arm, left upper chest, left wrist, right shoulder, right upper arm, and right upper back; a small puncture to his forehead; two puncture wounds to his middle back; three puncture wounds to his right upper back; two puncture wounds to his right lower back; and three puncture wounds to his right upper chest. (Doc. 26-2). Per the order of the doctor at Holman, Whetstone was transferred by ambulance to Atmore Community Hospital for further medical treatment. (Doc. 26-1). On July 16, 2018, Whetstone returned from Atmore Community Hospital and was placed in the hospital ward pursuant to the doctor's orders. (Id.).

On the same day that Whetstone was stabbed, Officer Jermaine Bullard informed Lieutenant Walter Franklin that inmate Elliot Ramsey had been stabbed in A-Dorm. (Id.). Inmate Ramsey sustained four puncture wounds to the right side of his neck, left shoulder,

left upper arm, and left upper back. (Id.). No weapon was recovered, and inmate Ramsey was placed in the Restrictive Housing Unit. (Id.).

An I&I Investigative Report for the stabbings was completed by Agent Robert White on July 23, 2018. (Doc. 32-3). The Investigative Report lists the same incident facts as the Incident Report. (See id. at 1). It further states that Agent White attempted to take a recorded statement from Whetstone on July 19, 2018, but Whetstone refused to give a statement and stated that "he did not want to have anything to do with it and just wanted out to see his folks." (Id.). Agent White also took a recorded statement from inmate Elliot Ramsey on July 19, 2018. (Id.). Inmate Ramsey stated that the incident started the night before the stabbings, when he and another inmate affiliated with the Gangster Disciples[7] known as "Fat Mack"[8] got into an argument over the smuggling of cell phones. (Id. at 1-2). According to inmate Ramsey, a couple of inmates passed by during argument and told him that he had two options: "he could either get off the compound or stand." (Id. at 2). Inmate Ramsey told the inmates he was "not running from no one." (Id.). Inmate Ramsey further stated that

---

[7] Inmate Ramsey stated that he was affiliated with the Gangster Disciples at one time but was no longer affiliated with them. (Doc. 32-3 at 2).

[8] The inmate known as "Fat Mack" was not identified during the investigation. (Doc. 32-3 at 2).

he went back and put his clothes on, "and about seven inmates came in and it went from there." (Id.). Inmate Ramsey reported that "he didn't get stabbed too bad, but inmate Whetstone got stabbed up good." (Id.). The case was closed due to lack of prosecution and/or cooperation by the victims. (Id.).

### C. Conversion to Motion for Summary Judgment.

In an order dated November 9, 2021, the Court converted Defendants' answer and special reports into a motion for summary judgment (Doc. 36), explained to the parties the procedure for such motions under Federal Rule of Civil Procedure 56, and afforded the parties an opportunity to submit additional information or evidence in support of or in opposition to the motion by January 3, 2022. (Doc. 37). The Court also ordered Whetstone to inform the Court in writing, by January 3, 2022, whether he desired to continue the litigation of this action. (Id. at 4). Whetstone filed a notice stating his desire to continue the litigation of this action (Doc. 38), but he submitted no additional information or evidence in opposition to the converted summary judgment motion.

After a thorough review of the parties' submissions, the motion for summary judgment (Doc. 36) is ripe for consideration.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing there is no genuine dispute of material fact, or by showing or pointing out to the district court that the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Id. at 322-24.

"When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (per curiam) (quoting Celotex, 477 U.S. at 324). "To defeat a motion for summary

judgment, the nonmoving party may not rely on 'mere allegations.' It must raise 'significant probative evidence' that would be sufficient for a jury to find for that party." LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 835 (11th Cir. 1998) (citations omitted). In other words, there is no genuine issue for trial where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

In considering whether the Defendants are entitled to summary judgment in this case, the Court views the facts in the light most favorable to Plaintiff Whetstone. See Comer v. City of Palm Bay, Fla., 265 F.3d 1186, 1192 (11th Cir. 2001) (per curiam) ("We view the evidence and all factual inferences raised by it in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-moving party.").

> The requirement to view the facts in the nonmoving party's favor extends only to "genuine" disputes over material facts. A genuine dispute requires more than "some metaphysical doubt as to the material facts." A "mere scintilla" of evidence is insufficient; the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment.

Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (2009) (per curiam) (internal citations omitted). In addition, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587,

10

599 (11th Cir. 1995). Furthermore, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007).

## III. <u>DISCUSSION</u>

### A. **Qualified Immunity.**

Defendants have pled the defense of qualified immunity against the allegations asserted against them. (<u>See</u> Doc. 25 at 2; Doc. 26 at 4-14). "The defense of qualified immunity completely protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Marbury v. Warden</u>, 936 F.3d 1227, 1232 (11th Cir. 2019) (per curiam) (citations omitted). Since the record evidence reflects that Defendants were acting within the scope of their discretionary authority at all relevant times, the burden shifts to Whetstone to show (1) that Defendants violated a constitutional right, and (2) that the right was clearly established at the time of the alleged violation.[9] <u>See id.</u>

_____

[9] "To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what

11

Defendants contend that Whetstone has failed to meet his burden with respect to the first qualified immunity prong because he has failed to show a constitutional violation. (Doc. 26 at 7). The Court now turns to Whetstone's asserted claims to determine whether the summary judgment evidence creates a genuine issue of material fact as to whether Defendants violated a constitutional right.

**B.    Eighth Amendment - Failure to Protect.**

As noted above, Whetstone seeks redress pursuant to 42 U.S.C. § 1983 for Eighth Amendment violations based on an attack by fellow inmates. (See Doc. 1). Section 1983 creates a private right of action against any person acting under the color of state law who deprives another of a federal constitutional right. See 42 U.S.C. § 1983. The Eighth Amendment, applicable to the states through the Fourteenth Amendment, governs the conditions under which convicted prisoners are confined and the treatment they receive

---

he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." Reichle v. Howards, 566 U.S. 658, 664 (2012) (internal quotation marks and citations omitted). For a right to be clearly established, either (1) "a materially similar case has already been decided"; (2) there is "a broader, clearly established principle that should control the novel facts of the situation"; or (3) "the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary." Gaines v. Wardynski, 871 F.3d 1203, 1208-09 (11th Cir. 2017) (quotation omitted). The controlling authority must be "from the Supreme Court of the United States, the Eleventh Circuit, or the highest court in the relevant state." Id. at 1209.

while in prison.  <u>Farrow v. West</u>, 320 F.3d 1235, 1242 (11th Cir. 2003); <u>Bass v. Perrin</u>, 170 F.3d 1312, 1316 (11th Cir. 1999).  The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.

The Eighth Amendment's proscription against cruel and unusual punishment imposes a duty on prison officials "to 'take reasonable measures to guarantee the safety of the inmates.'"  <u>Caldwell v. Warden, FCI Talladega</u>, 748 F.3d 1090, 1099 (11th Cir. 2014) (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994)).  "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety."  <u>Farmer</u>, 511 U.S. at 834.  The Eleventh Circuit has stressed "that a 'prison custodian is not the guarantor of a prisoner's safety.'"  <u>Purcell v. Toombs County, Ga.</u>, 400 F.3d 1313, 1321 (11th Cir. 2005) (citation omitted).

"A prison official violates the Eighth Amendment 'when a substantial risk of serious harm, *of which the official is subjectively aware*, exists and the official does not respond reasonably to the risk.'"  <u>Caldwell</u>, 748 F.3d at 1099 (emphasis in original) (citation omitted).  To survive summary judgment on an Eighth Amendment claim under § 1983, a plaintiff must "produce sufficient evidence of (1) a substantial risk of serious harm; (2)

the defendants' deliberate indifference to that risk; and (3) causation." Hale v. Tallapoosa County, 50 F.3d 1579, 1582 (11th Cir. 1995).

The first element — a substantial risk of serious harm — is measured against an objective standard. Caldwell, 748 F.3d at 1099. Under this standard, the alleged condition must be "so extreme that it poses an unreasonable risk of serious damage to the prisoner's health or safety." Richardson v. Johnson, 598 F.3d 734, 737 (11th Cir. 2010) (per curiam).

The second element — the prison official's deliberate indifference to the risk — "has both a subjective and an objective component." Marbury, 936 F.3d at 1233. "To satisfy the subjective component, a plaintiff must produce evidence that the defendant 'actually (subjectively) knew that an inmate faced a substantial risk of serious harm.'" Caldwell, 748 F.3d at 1099 (citation and alterations omitted). The defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. "The known risk of injury must be a strong likelihood, rather than a mere possibility before a [prison official's] failure to act can constitute deliberate indifference." Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990) (per curiam) (quotations omitted). To meet the objective component, a plaintiff must produce evidence that the defendant

14

"responded to the known risk in an unreasonable manner, in that he or she 'knew of ways to reduce the harm' but knowingly or recklessly declined to act." Marbury, 936 F.3d at 1233 (citation omitted). "Merely negligent failure to protect an inmate from attack does not justify liability under section 1983[.]" Brown, 894 F.2d at 1537.

The third element — causation — requires a plaintiff to "show a 'necessary causal link' between the officer's failure to act reasonably and the plaintiff's injury." Marbury, 936 F.3d at 1233 (citation omitted).

In the current action, Whetstone brings suit against three supervisory Defendants and makes no claims against the officers who were actually present at Holman when he was stabbed. "It is well established that § 1983 claims may not be brought against supervisory officials on the basis of vicarious liability or respondeat superior." Keating v. City of Miami, 598 F.3d 753, 762 (11th Cir. 2010). A supervisory prison official can be held liable under § 1983 only if they personally participated in the unconstitutional conduct or if there is a "causal connection" between the supervisor's actions and the alleged constitutional violation. West v. Tillman, 496 F.3d 1321, 1328 (11th Cir. 2007) (per curiam).

> A causal connection can be established when a history of
> widespread abuse puts the responsible supervisor on
> notice of the need to correct the alleged deprivation

and he fails to do so; when the supervisor's improper
custom or policy leads to deliberate indifference to
constitutional rights; or when facts support an
inference that the supervisor directed the subordinates
to act unlawfully or knew that the subordinates would
act unlawfully and failed to stop them from doing so.

Douglas v. Yates, 535 F.3d 1316, 1322 (11th Cir. 2008).

Construing Whetstone's complaint liberally, he alleges that
Wardens Stewart, Raybon, and Mitchell acted with deliberate
indifference to his safety by failing to hire adequate correctional
officers to correct the "egregious" level of understaffing at
Holman and "placing" him in an overcrowded dormitory without having
an adequate number of officers to supervise and protect the inmates
in the dormitory. (See Doc. 1 at 14-17).

For purposes of this motion, the Court accepts as true
Whetstone's version of the stabbing incident,[10] including his
testimony that there was no correctional officer monitoring A-Dorm
at the time of the incident.[11] However, having reviewed the record
at length, the Court finds that Whetstone has nevertheless failed
to put forth probative evidence showing deliberate indifference to

_____

[10] However, as noted previously, the record reflects that the
stabbing incident occurred on July 15, 2018, and not on July 29,
2018, as Whetstone alleges.

[11] Indeed, the record reflects that the Dorm A Rover, Officer
Bullard, was assigned to the exit door during the population
feeding of the breakfast meal. (See Doc. 26-3 at 2, 8). Moreover,
the Incident Report does not indicate that an officer was present
in A-Dorm during or immediately before the stabbing incident. (See
Doc. 26-1).

an objectively substantial serious risk of harm posed by any other inmate to Whetstone prior to the attack on July 15, 2018.

First, Whetstone does not allege or present any evidence that he was aware or fearful of a possible attack at the time it occurred. There is no evidence that Whetstone and inmates Birdsong or Elliot (or any other inmates at Holman) were considered enemies at the time the incident occurred. Indeed, even after the attack, Whetstone cannot identify eight of his nine attackers by name. (See id. at 9). Nor has Whetstone demonstrated that any of the Defendants were apprised that any inmate at Holman posed a risk to his health or safety. See McGill v. Duckworth, 944 F.2d 344, 349 (7th Cir. 1991) (stating that a plaintiff "normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety"), overruled in part on other grounds by Farmer, 511 U.S. at 828. Thus, no reasonable fact finder could conclude that Defendants acted with intentional or reckless disregard to a known specific risk of harm to Whetstone.

Whetstone has also failed to produce probative evidence showing that he faced a generalized, substantial risk of serious harm from inmate violence at Holman generally or A-Dorm specifically. The Eleventh Circuit has declared that a claim of deliberate indifference based on a generalized risk of violence may only be established by showing "that serious inmate-on-inmate

violence was the norm or something close to it[,]" which is generally evidenced by "specific features of a facility or its population rendering it particularly violent[,]" such as "pervasive staffing and logistical issues rendering prison officials unable to address near-constant violence, tensions between different subsets of a prison population, and unique risks posed by individual prisoners or groups of prisoners due to characteristics like mental illness." Marbury, 936 F.3d at 1234-35 (quotation omitted).

In Hale, the Eleventh Circuit determined that the plaintiff had presented sufficient evidence of a generalized, substantial risk of serious harm from inmate violence to survive summary judgment where the record showed that prisoners were not segregated based on their proclivity for violence; there was only one jailer on duty; the jailer's quarters were out of earshot and eyesight of the prisoners' cell; and fights occurred between inmates on a regular basis resulting in injuries requiring medical attention and hospitalization. 50 F.3d at 1581-84.

Also, in Marsh v. Butler County, Ala., 268 F.3d 1014 (11th Cir. 2001) (en banc), the Eleventh Circuit held that the former inmate plaintiffs had sufficiently alleged conditions posing a substantial risk of serious harm to inmates when they alleged:

> 1) there was no segregation of nonviolent inmates from violent inmates, pretrial detainees from convicted criminals, juveniles from adults, or inmates with mental

disorders from those without mental disorders, 2) at
times the Jail housed more prisoners than the cells could
accommodate, 3) the Jail was routinely understaffed, 4)
no head counts of prisoners were made to make sure they
were all accounted for, 5) locks on cell doors were not
functional, allowing inmates to roam freely at all hours
of the day, 6) homemade weapons were readily available
by fashioning weapons from material torn from the
dilapidated structure of the Jail, 7) no lock down of
prisoners in their cells occurred at any point during
the day or night, 8) cells were not visually inspected,
9) no jailer was assigned to maintain prisoners'
security on the second floor where most of the inmates
were housed, 10) the Jail was not operated in accordance
with written policies, 11) inmates were not screened for
mental health, medical conditions or conflicts with
other prisoners before entering the Jail, and 12)
prisoners were not disciplined or segregated when they
attempted to escape, threatened jailers, destroyed
property or assaulted other inmates.

Id. at 1029. The Court reasoned that, "[t]aken as a whole, these

alleged conditions, if true, present an objectively substantial

risk of serious harm—including the risk of inmate-on-inmate

attacks—to inmates. This risk violates the Eighth Amendment's

requirement 'that inmates be furnished with the basic human needs,

one of which is "reasonable safety."'" Id. (quoting Helling v.

McKinney, 509 U.S. 25, 33 (1993)).

The Eleventh Circuit has stressed that Hale and Marsh are not

the "proverbial 'floor' of liability for Eighth Amendment purposes"

but that the conditions evidenced by the records must be

"sufficiently grave to violate the Constitution." Purcell, 400

F.3d at 1323. "Whether a substantial risk of serious harm exists

so that the Eighth Amendment might be violated involves a legal

rule that takes form through its application to facts." Id. at 1320. The cases below evidence facts courts have considered insufficient to establish that prison conditions "rose to the level of a 'substantial' or 'sufficiently serious' risk as opposed to some lesser risk of harm[,]" given that "[i]n the jail setting, a risk of harm to some degree always exists by the nature of its being a jail." See id. at 1323 (citation omitted).

For instance, in Purcell, the Court determined that the record did not support the plaintiff's contention that jail conditions posed the substantial risk of serious harm necessary for a constitutional violation where the inmates were segregated based on a number of particularized factors (including the type of crime committed and potential personal conflicts with others); the jail was properly staffed (with the typical number of five officers being on duty during the night of the subject attack); officials had a history of addressing and punishing inmate violence; the fights that occurred were not linked to any recurring specific cause; and the guards testified they periodically walked the cellblock. Id. at 1321-23.

Also, in Harrison v. Culliver, 746 F.3d 1288 (11th Cir. 2014), the plaintiff adduced evidence of thirty-three incidents of inmate-on-inmate violence involving weapons over the span of three-and-a-half years, four of which occurred in the same hallway where the plaintiff was assaulted, in a prison which housed between

830 and 990 inmates. Id. at 1299-1300. The Court concluded that the evidence presented was "hardly sufficient to demonstrate that [the facility] was a prison 'where violence and terror reign.'" Id. at 1300 (citation omitted); see also Lorenzo v. Williams, 2018 WL 3863529, at *7 (S.D. Ga. July 30, 2018) (concluding, in the face of evidence that the prison had an average of six inmate-on-inmate assaults per month in a population of 1500-1600 in the year the decedent was attacked, "that these superficial statistics [were] insufficient to demonstrate a substantial risk of serious harm to inmates at [the prison]").

Finally, in Marbury, the plaintiff affirmed that he had personally witnessed fifteen apparent gang-related inmate stabbings prior to the incident in which he was stabbed, had sent a written request to the warden asking to be moved to another dorm (he described his dorm as an "over-rated gang affiliated block"), and had made several more in-person requests to be transferred. 936 F.3d at 1231. The Eleventh Circuit panel majority found the evidence insufficient to establish deliberate indifference based on a generalized risk of inmate-on-inmate violence. Id. at 1235. The panel majority expounded that in cases where the Eleventh Circuit had previously "held that a generalized risk of violence from a prison population could support a claim of deliberate indifference to a substantial risk of serious harm, the plaintiff ha[d] pointed to specific features of a facility or its population

rendering it particularly violent." Id. The panel majority stated that although the record showed that inmates faced some risk of assaults by fellow prisoners, the plaintiff had failed to identify "specific features of the prison that would make it particularly violent" and "failed to produce evidence that he was in an environment so beset by violence that confinement, by its nature, threatened him with the substantial risk of serious harm." Id.; but cf. Dickinson v. Cochran, 833 F. App'x 268, 275 (11th Cir. 2020) (per curiam) (finding that the plaintiff sufficiently alleged "specific feature of the jail that render[ed] it particularly violent" where the plaintiff "alleged overcrowding, failure to identify and segregate violent inmates, failure to properly search inmates, failure to limit contraband, and failure to adequately supervise inmates").

Here, Whetstone's only relevant allegations are that Holman was egregiously understaffed, that his housing unit was overcrowded, and that no guards were present to monitor A-Dorm immediately before and during his attack. (Doc. 1 at 9). Whetstone's purely generalized assertions of overcrowding and understaffing are not sufficient to show that he faced a generalized, substantial risk of serious harm from inmate violence in his dormitory at Holman. Whetstone has pointed to no specific features of Holman or its population rendering it particularly violent. See Marbury, 936 F.3d at 1235. Further, the record is

devoid of evidence that "serious inmate-on-inmate violence was the norm or something close to it" at Holman. See id. at 1234. Whetstone does not claim to have participated in, witnessed, or been the victim of any other incidents of inmate-on-inmate violence at Holman. Nor does he claim to have been threatened with violence by other inmates. Simply put, Whetstone has failed to carry his burden of identifying "specific facts" showing "that he was in an environment so beset by violence that confinement, by its nature, threatened him with the substantial risk of serious harm." See Carter v. Galloway, 352 F.3d 1346, 1349 (11th Cir. 2003) (per curiam); Marbury, 936 F.3d at 1235. Indeed, Whetstone has clearly presented far less evidence about the level of violence at Holman and its dormitories than the evidence presented in both Harrison and Marbury, which the Eleventh Circuit found insufficient to show that inmate-on-inmate violence was so pervasive that it amounted to the substantial risk of serious harm necessary to support a deliberate indifference claim. Whetstone's allegations may suffice to establish the "mere possibility" of injury, but they plainly fail to carry his burden of establishing a "strong likelihood" of injury. See Brown, 894 F.2d at 1537.

Accordingly, Whetstone has failed to establish an Eighth Amendment violation against the Defendants, and Defendants are thus entitled to qualified immunity. Therefore, it is recommended

that summary judgment be **GRANTED** in favor of Defendants Wardens Stewart, Raybon, and Mitchell.

## IV.    CONCLUSION

Based on the foregoing, the undersigned recommends that summary judgment be **GRANTED** in favor of Defendants Warden Cynthia Stewart, Warden Terry Raybon, and Warden Phillip Mitchell on Plaintiff Ja'Kari Whetstone's claims against them, and that this action be **DISMISSED.**

The instructions that follow contain important information regarding objections to the report and recommendation of the Magistrate Judge.

### NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. Ala. GenLR 72(c).  The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period

for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1.

In order to be specific, an objection must identify the specific place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this **14th** day of **July, 2022.**

**/s/ SONJA F. BIVINS**
**UNITED STATES MAGISTRATE JUDGE**